UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMUEL MOLINA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 11-1759 (ABJ) |
| ) | |
| FEDERAL DEPOSIT INSURANCE ) | |
| CORPORATION, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION

Plaintiff Samuel Molina brings this action against defendants Federal Deposit Insurance Corporation ("FDIC"), Ocwen Loan Servicing, LLC ("Ocwen"), and Shapiro & Burson, LLP ("Shapiro & Burson") alleging that their involvement in the acquisition, servicing, and foreclosure of his subprime mortgage violated the Equal Credit Opportunity Act, the Fair Housing Act, section 1982 of the Civil Rights Act, and the Fair Debt Collection Practices Act ("FDCPA"). All three defendants move the Court to dismiss this action for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). Defendant FDIC also moves to dismiss for lack of personal jurisdiction. Because plaintiff has not alleged facts showing that he suffered any injury in fact fairly traceable to defendants, the Court will grant defendants' motions and dismiss the action for lack of standing.

## I.   BACKGROUND

### A.  Factual Background

On October 3, 2011, plaintiff Samuel Molina brought this action on behalf of himself and a putative class of Latino subprime mortgage borrowers,[1] alleging that Taylor, Bean & Whitaker Mortgage Company ("TBW"); Ocwen; and Shapiro & Burson engaged in discriminatory lending, servicing, and foreclosure practices that disparately impacted minority borrowers.[2] Compl. ¶¶ 94-126.

Defendants are three entities involved with lending, loan servicing, and foreclosure. TBW was a mortgage company that allegedly originated a loan on plaintiff's home, but has since filed for Chapter 11 bankruptcy.  Compl. [Dkt. # 1] ¶ 3, 12; FDIC's Mot. to Dismiss [Dkt. # 23] at 1.  Plaintiff alleges that FDIC is receiver for the now-defunct TBW and thus liable for its debts.  Compl ¶ 3.  According to plaintiff, Ocwen is a "financial services company" that "offers financial administration services to third-parties that own mortgage-related investment products[,]" and these services focus on subprime loans.  *Id.* ¶¶ 4.  Ocwen allegedly contracted with a third-party debt collection agency and law firm, Shapiro & Burson, to conduct foreclosures of mortgages on its behalf.  *Id.* ¶¶ 6, 44.

1. <u>TBW and FDIC</u>

Plaintiff purchased a home in Virginia in 1996 in a purchase-money transaction.  *Id.* ¶ 11. Ten years later, he elected to refinance his home by obtaining a twenty-year fixed-rate mortgage from TBW.  *Id.* ¶ 12.  Plaintiff claims that although he spoke little English at the time of his

---

1   The Court has stayed all motions for class certification pending this decision on the motions to dismiss.  Minute Order (Jan. 5, 2012).

2   Plaintiff's claim against TBW is brought only by plaintiff as an individual, not as a representative of a class.  Compl. ¶¶ 94-103.

refinancing, his settlement was conducted entirely in English and all loan disclosures were printed in English. *Id.* ¶¶ 13–14. He also alleges that the TBW representative who prepared his loan applications misrepresented the financial data by underrepresenting his monthly payments and failing to take account of his credit history. *Id.* ¶¶ 15–16.

The remainder of the complaint against TBW is essentially an indictment of its business practices and their alleged disparate impact on minority borrowers. *Id.* ¶¶ 94–103. Plaintiff alleges that TBW "discriminated against minority home loan borrowers through a creative system of targeting and exploiting its customers" and through "[r]ampant predatory lending practices" that "created a unique loan pool consisting of large numbers of Latino borrowers with subprime loans." *Id.* ¶ 95. The complaint asserts that TBW

> targeted minorities for the purchase of subprime loans because of a belief that Latinos are less sophisticated financial consumers than whites and a belief that, due to Latinos' historical difficulty in obtaining credit from traditional financial institutions . . . they would be less likely or able to resist predatory lending practices than white borrowers[.]

*Id.* ¶ 98.

Plaintiff alleges that FDIC "stands as a court-appointed Receiver to resolve claims on [TBW's] behalf." *Id.* ¶ 3.

### 2. Ocwen

Plaintiff next alleges that sometime after he obtained his loan from TBW, it was "designated as subprime and bundled with other subprime mortgages and sold off to investors as

a mortgage-backed security." *Id.* ¶ 20.  Ocwen allegedly acquired the rights to service plaintiff's mortgage "at some point after settlement."[3]  *Id.*

According to the complaint, Ocwen engaged in "discriminatory loan servicing practices." *Id*. ¶ 23.  Plaintiff alleges that "[w]hile Ocwen's call centers allow for in-bound Spanish-speakers to speak with a Spanish-speaking representative, there was no policy in place, or at least implemented, with respect to out-bound calls."  Compl. ¶ 37.  He also claims that Ocwen's customer website and the notification emails it sends to borrowers regarding their Home Affordable Modification Program ("HAMP") application status are available only in English.  *Id.* ¶¶ 38–39.  Plaintiff claims that Ocwen's "otherwise facially neutral loss mitigation requirements, guidelines, policies, and procedures have a disparate impact on minority borrowers, such as American-born Latinos and Latino Immigrants [sic], that results in higher rates of foreclosure than similarly situated white borrowers."  Compl. ¶ 106.

The complaint also alleges that once a loan is more than ninety days past due, Ocwen pursues foreclosure alternatives and foreclosure "simultaneously on a dual track."  *Id.* ¶ 35.  Ocwen's staff allegedly maintains discretion over whether to enter into short-term repayment plans with borrowers, "based upon company-established guidelines."  *Id.* ¶¶ 34–35.  Eligibility for foreclosure alternatives is determined by a "loan resolution workstation," a proprietary software system based on a data model that takes into account factors such as property valuation, reason for default, and repayment ability, and plaintiff claims that these factors disproportionately exclude Latinos, placing them at a heightened risk of foreclosure.  *Id.* ¶ 35. Plaintiff alleges that Ocwen's policies deny minority borrowers the opportunity to explore

---

3  Plaintiff admits that Ocwen is not the current note-holder for his loan, and claims that he does not know who currently owns it.  Compl. ¶ 20.  Ocwen identifies the current note-holder as Freddie Mac.  Def. Ocwen's Mot. to Dismiss [Dkt. # 24] at 5.  Freddie Mac is not a party to this action.

alternatives to foreclosures when they default, even though such alternatives are typically offered to white borrowers. *Id.* ¶ 106.

Plaintiff also alleges that Ocwen's policies and procedures place an emphasis on speedy foreclosures, "far in excess of industry norms," forcing Latinos into foreclosure "in disproportionate numbers when compared to similarly situated non-minority borrowers." *Id.* ¶ 106(e). Plaintiff claims that these disparate impacts on minority borrowers amount to discriminatory practices that "will fundamentally alter, for the worse, characteristics of ethnic neighborhoods for decades to come." *Id.* ¶ 108.

### 3. Shapiro & Burson

Plaintiff also claims that law firm and debt collection agency Shapiro & Burson engaged in discriminatory practices. Compl. ¶ 116. Ocwen allegedly contracts with Shapiro & Burson to conduct foreclosures on defaulted loans. *Id.* ¶ 44. Plaintiff alleges that Shapiro & Burson engaged in "unlawfully relaxed foreclosure policies, practices, and procedures" to "deliver[] speedy foreclosures that cut corners and break the rules." *Id.* ¶ 114. The complaint further alleges that as a result of Shapiro & Burson's relaxed procedures, minority borrowers in general are "more likely to undergo foreclosure and less likely to receive an offer for foreclosure alternatives than similarly situated whites and American-born individuals." *Id.* ¶ 118. As to his own loan, plaintiff claims that "it is exceptionally unlikely that any of [Shapiro & Burson's] staff actually reviewed [p]laintiff's . . . mortgage information to verify that Ocwen Loan Servicing was the noteholder." *Id.* ¶ 113.

Plaintiff also claims that Shapiro & Burson engages in illegal "robo-signing" to ensure the faster signing of foreclosure documents. *Id.* ¶ 115. This operation allegedly results in a disproportionate number of foreclosures for minority borrowers. *Id.* ¶ 118. In support of that

allegation, plaintiff attaches an affidavit prepared by Jose Portillo, a former paralegal at Shapiro & Burson.  Portillo Aff. [Dkt. # 1-2] ¶ 3.  The affiant claims that he personally prepared and witnessed illegally robosigned foreclosure documents.  *Id.* ¶ 8–28.  Attached to the affidavit are exhibits, which the affiant identifies as forged foreclosure documents.  Ex. A–C to Portillo Aff.  The documents all concern foreclosures conducted on properties in Maryland.  *Id.*

### B. Procedural Background

Plaintiff filed this action on October 3, 2011 on behalf of himself and a class of minority subprime borrowers.  Compl. at 1.  More than two weeks after plaintiff filed the complaint, he filed an emergency motion for temporary restraining order and preliminary injunction.  Emer. Mot. for TRO and Prelim. Inj. [Dkt. # 10].  He later withdrew the motions voluntarily, noting that "[t]he relief requested in the [m]otions – the cancellation of the sale of [p]laintiff's home on October 25, 2011 – has been obtained."  [Dkt. # 12].

Counts I, II, and III of the complaint allege that TBW, for which FDIC is the receiver, disproportionately targeted Latinos for subprime loans in violation of the Equal Credit Opportunity Act, the Fair Housing Act, and section 1982 of the Civil Rights Act.  Compl. ¶¶ 94–103.  Counts III and IV allege that Ocwen has adopted and implemented guidelines, policies, and procedures that result in higher rates of foreclosure for minority borrowers, in violation of the Fair Housing Act and section 1982 of the Civil Rights Act.[4]  *Id.* ¶¶ 104–109.  Counts V and VI allege that Shapiro & Burson engages in foreclosure practices and procedures that violate the Fair Housing Act and the Civil Rights Act because they prevent minority borrowers from exploring foreclosure alternative programs.  *Id.* ¶¶ 110–119.  Count VII alleges that Shapiro & Burson maintains an illegal "robo-signing" operation and fails to conduct proper oversight and

---

4   The Complaint contains two Counts identified as "Count III."

due diligence in processing foreclosure documents, in violation of the Fair Debt Collection Practices Act.  *Id*. ¶¶ 120–126.

## II. STANDARD OF REVIEW

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (citation omitted).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibly Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  "Federal courts are courts of limited jurisdiction[]" and the law presumes that "a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  Because "subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'"  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction the Court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Rather, the Court "may consider such materials outside the pleadings as it deems appropriate to resolve the question of whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

The jurisdiction of the federal courts extends only to actual ongoing cases or controversies.  U.S. Const. art. III, § 2.  A lack of standing is therefore a defect in subject-matter jurisdiction.  *Haase v. Session*, 835 F.2d 902, 906 (D.C. Cir. 1987).  In order to establish constitutional standing, a plaintiff must demonstrate that a case or controversy exists by showing that (1) it has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly traceable" to the conduct of the defendant; and (3) that it is likely that the injury will be redressed by a favorable decision.  *George v. Napolitano*, 693 F. Supp. 2d. 125, 129–30 (D.D.C. 2010), citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000).

### III.   ANALYSIS

#### A.  Claims against FDIC

Plaintiff has brought this action against FDIC under the theory that FDIC acts as receiver for TBW – the entity that originally held plaintiff's mortgage and is now a Chapter 11 debtor in the U.S. Bankruptcy Court for the Middle District of Florida.  *See* Compl. ¶ 3; *In re: Taylor, Bean & Whitaker Mortg. Corp.*, Ch. 11 Case No. 3:09-bk-7047-JAF (Bankr. M.D. Fla. filed Aug. 24, 2009); *see also* Ex. B to FDIC's Mot. to Dismiss [Dkt. # 23-3] at 1.  However, by law,

FDIC is not the successor or receiver for TBW.  *See* 12 U.S.C. § 1821(d)(2)(A) (defining FDIC's authority to succeed as receiver to only insured *depository* institutions).  Plaintiff has not alleged that TBW was an FDIC-insured depository institution.  Rather, FDIC has provided an opinion of the bankruptcy court handling TBW's Chapter 11 proceedings, which reveals that TBW was a non-depository company that originated, underwrote, processed, funded, sold, and serviced mortgage loans.  *See* Ex. B to FDIC's Mot. to Dismiss at 1.  Thus, FDIC has no authority, responsibility, or jurisdiction to resolve claims against TBW. Therefore, no harms suffered by plaintiff can be fairly traced to FDIC.  *Lujan*, 504 U.S. at 560 (To prove standing, a plaintiff must show that his injury is fairly traceable to the actions of the defendant "and not . . . [from] the independent action of some third party not before the court.").

In its reply to FDIC's argument that it is not an appropriate defendant in this case, plaintiff asserts, for the first time, that FDIC is liable as the appointed receiver for non-party Colonial Bank, which was allegedly "the primary lender to and co-conspirator with [TBW] in the perpetration of a significant fraud scheme."  Pl.'s Opp. to FDIC Mot. to Dismiss [Dkt. # 27] at 1. Plaintiff argues that FDIC succeeded to Colonial Bank's liabilities, including TBW's debts, after it failed.  *Id.* at 1–2.

This argument fails for multiple reasons.  First, plaintiff has not named Colonial Bank as a defendant in this case, so to the extent that plaintiff's allegation rests on Colonial Bank's role in an alleged conspiracy to commit fraud, his theory of liability is not before this Court.  *See Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) (citations omitted) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.").  Furthermore, even if successor liability applied and FDIC were a proper defendant, this Court lacks jurisdiction because plaintiff has not shown that he has

9

properly exhausted his administrative remedies by filing a proof of claim with the FDIC-receiver. Starnes Decl. [Dkt. # 34-3] ¶ 6; *See* 12 U.S.C. § 1821(d)(5)(A), (6)(A), (13)(D) (judicial review is not available for a claimant except in cases where the claimant is seeking an appeal of the denial of an administrative claim); *see also Freeman v. FDIC*, 56 F.3d 1394, 1399–1400 (D.C. Cir. 1995) (explaining that 12 U.S.C. § 1821(d) creates a jurisdictional bar that requires a claimant to exhaust administrative remedies before bringing a claim against an FDIC-receiver in court); *Jahn v. FDIC*, 828 F. Supp. 2d 305, 310 (D.D.C. 2010) (same). All claims against FDIC will therefore be dismissed.

### B. Claims against Ocwen

The Court next turns to plaintiff's claims against Ocwen. While plaintiff levels some troubling accusations about the processes Ocwen uses to determine which borrowers are funneled toward foreclosure and which are offered foreclosure alternatives, and the disparate impact that those procedures may have on Hispanic borrowers, Compl. ¶¶ 106-07, he fails to allege that he himself suffered any injury as a result of Ocwen's practices. Moreover, he fails to allege that he was even subject to Ocwen's allegedly discriminatory practices. As a result, the Court finds that plaintiff lacks standing to bring his claims against Ocwen.

Injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). Neither plaintiff's complaint nor his briefs in opposition to the motions to dismiss allege any facts that would show that plaintiff suffered any concrete and particularized harm. They do not allege that plaintiff lost his house in a foreclosure or even that he was funneled toward foreclosure by Ocwen. Contrarily, in his complaint, Mr. Molina

asserts that "Mr. Samuel Molina is the *current owner* and *occupant* of the property[.]" Compl. ¶ 1 (emphasis added).

Instead of claiming that Mr. Molina suffered harm, the pleadings consistently discuss the harm that the members of the class of protected minorities that he seeks to represent suffered. *See, e.g.*, Compl. ¶¶ 34–66; Pl.'s Br. in Opp. to Ocwen's Mot. to Dismiss (Pl.'s Opp. to Ocwen's Mot.") [Dkt. # 28] at 2, 11–12. In his opposition to Ocwen's motion to dismiss, plaintiff claims that "Mr. Molina and the members of the proposed class were subjected to a series of abusive servicing practices." Pl.'s Opp. to Ocwen's Mot. at 2. However, when describing the harms that those servicing processes caused, plaintiff again fails to allege that he personally suffered any of those harms:

> [T]hese practices led to harms that disparately impacted the minority borrowers Mr. Molina seeks to represent: heightened fees and costs; increased exposure to harassing and illegal debt collection activities; diminished access to opportunities for foreclosure alternatives; increased risk to foreclosure and the concomitant loss of equity, assessment of fees, and credit damage that come [sic] with that risk; and the stress, anxiety, humiliation, depression, and anger caused by the abusive loan servicing practices that this lawsuit challenges.

Pl.'s Opp. to Ocwen Mot. to Dismiss at 2. Similarly, while Mr. Molina asserts that "Ocwen's rapid foreclosure process . . . has restricted and will continue to restrict the access of American-born Latinos and Latino immigrants from certain neighborhoods [and that i]t has affected and will continue to adversely affect access to quality education for the children of American-born Latinos and Latino immigrants[,]" Compl. ¶ 108, he does not allege that he was unable to maintain a home in the neighborhood or school district of his choice.

Moreover, even if the Court were to assume that plaintiff did at some point default on his loan,[5] plaintiff still fails to allege that he was subject to the Ocwen practices that he alleges are discriminatory. The complaint claims that "[w]hile Ocwen's call centers allow for in-bound Spanish speakers to speak with a Spanish-speaking representative, there was no policy in place, or at least implemented, with respect to out-bound calls made to Mr. Molina." Compl. ¶ 37. It also alleges that Ocwen's customer website and the notification emails it sends to borrowers regarding their HAMP application status are available only in English. *Id.* ¶ 39. However, plaintiff does not allege that he received any out-bound calls from Ocwen, that he ever attempted to access the website, that he applied for HAMP loan modification, or that he received any emails – in English or otherwise – about the program, let alone that Ocwen's failure to provide services in Spanish caused plaintiff to relinquish better loan repayment options that were available to him, to miss payments, or to incur any other injury.

Similarly, the complaint alleges that once a borrower defaults on his loan, Ocwen's staff has "discretionary authority to enter into short-term repayment plans with borrowers based upon company-established guidelines[,]" and that foreclosure alternative options are based on a data model "that disproportionately exclude[s] American-born Latinos and Latino immigrants and place[s] them at a heightened vulnerability to the financial and immaterial harms of foreclosure." Compl. ¶¶ 34–35; *see also* Compl. ¶¶ 36, 43–44. But plaintiff does not allege that he was ever

---

5   The Court might be able to infer that plaintiff at one point defaulted on his loan from the notice of withdrawal of the motion for temporary restraining order and preliminary injunction that he submitted to this Court. [Dkt. # 12]. In the notice, plaintiff explained that he was withdrawing his motions because "the relief requested in the motions – the cancellation of the sale of [p]laintiff's home on October 25, 2011 – has been obtained." *Id.* at 1.

put on the alleged foreclosure fast-track, that Ocwen did not present him with any foreclosure alternatives, or that Ocwen denied him a foreclosure alternative option.[6]

Alternatively, plaintiff alleges that the Court should find standing because plaintiff will inevitably be injured by Ocwen's discriminatory practices. Pl.'s Opp. to Ocwen's Mot. to Dismiss at 11. However, plaintiff does not allege that he is delinquent on his mortgage payments, and so the Court cannot find that he is subject to, or will even become subject to, Ocwen's allegedly discriminatory servicing practices, let alone that he will inevitably suffer harm because of them. *Cf. Grassroots Recycling Network v. EPA*, 429 F.3d 1109, 1112 (D.C. Cir. 2005) (finding that plaintiffs' allegation that an environmental regulation might cause their home values to decline sometime in the future was not sufficiently "imminent" to satisfy standing); *Seegars v. Gonzales*, 396 F.3d 1248, 1256 (D.C. Cir. 2005) (holding that plaintiffs

---

6    Plaintiff points the Court to an unreported decision from the District of Massachusetts. *Barrett v. H&R Block, Inc.*, Civil Action No. 08-10157, 2011 WL 1100105 (D. Mass. Mar. 21, 2011). The court there assessed standing as part of the typicality analysis for a motion for class certification. *Id.* at *2. The plaintiffs in that case alleged that the defendants, mortgage providers, gave their authorized brokers discretion to impose additional charges to a borrower's wholesale mortgage loans unrelated to the borrower's creditworthiness, and that the policy had a disparate impact on African American borrowers in that it resulted in their being charged higher rates than similarly situated white borrowers. *Id.* at *1–2. The plaintiffs were African American homeowners who had obtained a mortgage from one of the defendants. *Id.* at *1. The defendants argued, however, that certain of the plaintiffs had not met their burden of showing injury in fact because they had received loans that were priced more favorably than similarly situated white borrowers. *Id.* at *6. Absent individualized evidence that the named plaintiffs were actually disadvantaged, the defendants argued, they lacked standing, and thus were not typical of the class they sought to represent. *Id.* The court found that the plaintiffs satisfied the standing requirement because they had shown that they were subject to the discretionary pricing policy, a common practice that governed the pricing of all class members' mortgages, which they had alleged was harmful. *Id.*

This Court is not bound by an unreported case from the District of Massachusetts, but regardless, the facts here are distinguishable. First, the Massachusetts court was analyzing typicality for a motion for class certification, not the plaintiffs' standing to raise their claims. *See In re Lorazepam & Chlorazepate Antitrust Litig.*, 289 F.3d 98, 107–08 (D.C. Cir. 2002) ("Constitutional standing . . . is a *prerequisite* to class certification") (emphasis added). Furthermore, unlike the plaintiffs in that case, plaintiff here has not shown that he was, or is currently, subject to the practices that he alleges are discriminatory.

lacked standing to challenge District of Columbia gun control laws despite plaintiffs' intent to openly violate them because no prosecution against plaintiffs was imminent).

Accordingly, the Court finds that plaintiff lacks standing to bring his claims against defendant Ocwen.

### C. Claims against Shapiro & Burson

As with plaintiff's claims against Ocwen, plaintiff cannot point to any concrete and particularized injury he has suffered that is fairly traceable to Shapiro & Burson. Plaintiff has not alleged that his property was foreclosed upon, or that he suffered any other concrete harm as a result of actions taken by Shapiro & Burson. Although plaintiff alleges that Shapiro & Burson has a general practice of failing to verify ownership of the loans on which it conducts foreclosures and engages in illegal robo-signing, Compl. ¶¶ 112-15, he does not claim that this practice injured him in any way.

In fact, plaintiff does not even claim that the alleged wrongdoing by Shapiro & Burson has any relation to his loan at all. He does not allege that the law firm improperly failed to verify ownership of *his* loan, that *his* foreclosure documents, if any, were signed without authorization, or that an attorney failed to review *his* mortgage documents. Exhibit B to the complaint contains an affidavit from a former Shapiro & Burson employee ("Portillo Affidavit") who claims to have personally witnessed and participated in a robo-signing scheme by Shapiro & Burson, along with examples of allegedly forged foreclosure documents. *See* Portillo Aff. [Dkt. # 1-2] at 11–28. However, the allegations and sample documents do not relate to any documents from plaintiff's mortgage, or even documents related to mortgages in the state of Virginia, where plaintiff's home is located. Plaintiff merely alleges that it is "*exceptionally unlikely*" that Shapiro & Burson "reviewed [p]laintiff's . . . mortgage information." Compl. ¶ 113 (emphasis added). Such a

"conjectural or hypothetical" statement does not amount to a factual allegation of "concrete and particularized" injury, as required to satisfy Article III standing. *Cf. Grassroots Recycling Network*, 429 F.3d at 1112 (holding that plaintiffs' allegation that they would have paid less for their homes had they known that neighboring land could be converted into a bioreactor was not sufficiently "imminent" to satisfy standing because it failed to show that the fair market value of the homes had actually been affected).

For claims under the FDCPA, a plaintiff is not required to show actual damages, but he must at least allege that the defendant made an unlawful attempt to recover his debt. *Muldrow v. EMC Mortg. Corp.*, 766 F. Supp. 2d 230, 235 & n.1 (D.D.C. 2011), citing *Miller v. Wolpoff Abramson, LLP*, 321 F.3d 292, 307 (2d Cir. 2003). In *Miller*, the Second Circuit held that although a plaintiff may not be able to demonstrate an "identifiable injury[,] [t]he FDCPA provides for liability for attempting to collect an unlawful debt, however, and permits the recovery of statutory damages up to $1000[.]" 321 F.3d at 307. Thus, a plaintiff may establish standing if he can demonstrate that the debt collector "attempted to collect money in violation of the FDCPA." *Id.* However, since plaintiff never alleges that Shapiro & Burson unlawfully attempted to collect money from him, as described above, he fails to meet the requirements for standing even under this lower bar.

All claims against Shapiro & Burson will therefore be dismissed.

## IV.     CONCLUSION

For the reasons set forth above, the Court finds that plaintiff lacks standing to bring any of the claims in the complaint. Accordingly, the Court will grant defendants' motions to dismiss [Dkt. # 22, 23, 24] and dismiss the action. A separate order will issue.

                                  //s//

                                  AMY BERMAN JACKSON
                                  United States District Judge

DATE:  June 28, 2012